**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No.

ARMANDO RUBIO FLORES,
ALFONSO ANGELES HERNANDEZ,
ISRAIN HERNANDEZ JACOBO,
Individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

J & T HARVESTING LLC,
MARIA DIANA OLIVAREZ MILLS (aka DIANA OLIVAREZ RAMON, DIANA
OLIVARES, DIANA RAMON), Individually,
JOHN JEFFREY RAMON, Individually,
TATIANA BRAVO Individually,
MOUNTAINKING POTATOES, INC.,
FARMING TECHNOLOGY, INC. d/b/a MOUNTAINKING POTATOES, INC.,
FARMING TECHNOLOGY CORPORATION d/b/a MOUNTAINKING POTATOES, INC.,
SMOKIN-SPUDS, INC. d/b/a MOUNTAINKING POTATOES, INC., and
ALPINE POTATO COMPANY,

      Defendants.

---

**PLAINTIFFS' INITIAL COMPLAINT AND JURY DEMAND**

---

## I.    <u>PRELIMINARY STATEMENT</u>

1.    Plaintiffs are three Mexican Nationals who lawfully entered the United States in

2022 pursuant to 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c), and 1188(a)(1) ("the H-2A Program")

to perform labor harvesting crops in Uvalde, Texas but were trafficked into a forced labor scheme

in the San Luis Valley of Colorado.

2.      Plaintiffs bring this action to assert claims under the under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589 *et seq.* ("TVPRA"), Colorado Minimum Wage of Workers Act, Colo. Rev. Stat. §§ 8-6-101 *et seq.* as implemented by the Colorado Minimum and Overtime Standards ("COMPS"), 7 Colo. Code Regs. § 1103-1, the Colorado Wage Claim Act, Colo. Rev. Stat. §§ 8-4-101 *et seq.* ("CWCA"), and Colorado common law. Plaintiffs seek to bring the FLSA claim as a collective action pursuant to Section 216(b) and have attached their signed FLSA consent forms hereto as Exhibit A.

3.      With no fixed-site agricultural operation of their own, prior to the Fall of 2022, Defendants J&T Harvesting, LLC ("J&T"), Maria Diana Olivarez Mills, John Ramon, and Tatiana Bravo (collectively "J&T Defendants") procured contracts with operators of various potato packing warehouses in the San Luis Valley of Colorado, including Defendants MountainKing Potatoes, Inc., Farming Technology, Inc., Farming Technology Corporation, Smokin-Spuds, Inc. (collectively "MoutainKing Defendants"), and Alpine Potato Company ("Alpine") seeking the benefits of an H-2A workforce to work in their packing sheds without the costs of direct H-2A Program participation. Where necessary, this Complaint will refer to the entities operating the potato packing warehouses where Plaintiffs were employed as the "Potato Warehouse Defendants."

4.      J&T Defendants targeted individuals residing throughout Mexico whom they could convince to pay recruitment fees and their own travel and visa fees—in violation of the H-2A Program—for the opportunity to work lawfully in the U.S., using false promises about the wages and working conditions that would be provided.

5.      Plaintiffs traveled hundreds of miles from their hometowns in Mexico for the opportunity to work lawfully in the United States to provide for their families. Instead, Plaintiffs incurred crippling debt as a result of the unlawfully charged recruitment fees and expenses Plaintiffs were required to pay for their visas and travel to Uvalde, Texas, and later to Colorado.

6.      Upon arrival in the United States, Plaintiffs were not provided food, water, or money for more than three weeks.

7.      Once Plaintiffs were put to work for Potato Warehouse Defendants, J&T Defendants exploited Plaintiffs' indebtedness, housed them in substandard conditions (which they unlawfully required Plaintiffs to pay for), restricted their movement and interaction with others, and cultivated a climate of fear, which compelled Plaintiffs to believe they had no choice but to stay and work for Defendants at lower wages than they were legally owed and had been promised. Potato Warehouse Defendants were aware of the circumstances under which Plaintiffs were forced to work and enjoyed the benefit of Plaintiffs' forced labor.

8.      Plaintiffs now bring claims against J&T Defendants and Potato Warehouse Defendants for unpaid wages, including minimum wages as required by the FLSA, promised wages under the CWCA, and breach of their employment contracts. Plaintiffs further bring claims under the TVPRA against J&T Defendants for using threats, coercion, and exploitation to compel Plaintiffs' labor, as well as against the Potato Warehouse Defendants who knowingly financially benefitted from J&T Defendants' fraudulent scheme.

9.      Plaintiffs seek damages, declaratory and injunctive relief, pre- and post-judgment interest, costs, attorneys' fees, and other appropriate relief to make themselves whole for damages suffered due to Defendants' violations of law.

3

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 (federal question) and 1337 (Interstate Commerce), 29 U.S.C. § 216(b) (FLSA), and 18 U.S.C. § 1595 (TVPRA), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under Colorado law.

11.    Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

12.    Venue is proper pursuant to 28 U.S.C. § 1391 because at all times relevant to this Complaint, regular and substantial business activities of all Defendants occurred in the San Luis Valley of Colorado and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado and within the jurisdiction of the United States District of Colorado.

## III.    PARTIES

### PLAINTIFFS

13.    Named Plaintiffs Armando Rubio Flores, Alfonso Angeles Hernandez, and Israin Hernandez Jacobo are citizens of Mexico who were admitted to the U.S. on a temporary basis with visas pursuant to the H-2A Program, to perform agricultural labor beginning in October 2022.

14.    J&T Defendants recruited, hired, housed, and transported Plaintiffs to their worksites in Colorado. J&T Defendants then—pursuant to contracts between Defendant J&T Harvesting and Potato Warehouse Defendants—put Plaintiffs to work at potato packing facilities owned and operated by Potato Warehouse Defendants in the San Luis Valley of Colorado.

15.    At all relevant times, all similarly situated workers whom Plaintiffs seek to represent were citizens of Mexico, recruited by J&T Defendants, lawfully admitted to the United States on H-2A visas to perform agricultural labor and/or brought to Colorado to work at facilities

owned by Potato Warehouse Defendants, and employed by all Defendants (also referred to as "J&T Workers"). Agents of J&T Defendants, including Carlos Hernandez and Pabel Juan Martinez, are excluded from those similarly situated whom Plaintiffs seek to represent in this Action.

16.    From approximately October 17, 2022, through the date each Plaintiff escaped their employment, both J&T Defendants and Potato Warehouse Defendants at whose location they worked had the power to exercise control over Plaintiffs and those similarly situated.

17.    Plaintiff Rubio Flores worked at MountainKing Defendants' potato packing facility located in Center, Colorado from approximately October 17, 2022, until approximately November 17, 2022.

18.    Plaintiffs Angeles Hernandez and Hernandez Jacobo worked at Defendant Alpine's potato packing facility located in Center, Colorado from approximately October 17, 2022, until approximately November 17, 2022.

19.    J&T Defendants transported Plaintiffs and the other J&T Workers to and from work each day, but MountainKing Defendants and Defendant Alpine determined the work schedule and provided the training, supervision, and direction over their daily work.

20.    MountainKing Defendants and Defendant Alpine provided J&T Defendants with lump sum payments of money. J&T Defendants would then determine the amounts to be paid to Plaintiffs and the other J&T Workers.

21.    Throughout the entirety of their employment, Plaintiffs were employed by Defendants to perform agricultural and related work for Defendants in Colorado.

22.     At all times relevant to this Complaint, Plaintiffs were engaged in commerce or in the production of goods for commerce, or were employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A) of the FLSA.

**DEFENDANTS**

23.     Defendant J&T Harvesting, LLC ("J&T") is a foreign limited liability corporation, organized and registered in the State of Texas with a registered street address of 250 Mills Lane, Uvalde, Texas 78801.

24.     Defendant J&T is owned by Defendants John J. Ramon ("Ramon") and Tatiana Bravo ("Bravo").

25.     Defendant Ramon is an individual residing in Uvalde, Texas.

26.     Defendant Bravo is an individual residing in Uvalde, Texas. Defendant Bravo is the registered agent of J&T. She is also the wife of Defendant Ramon.

27.     Defendant Ramon's mother, Maria Diana Olivarez Mills (also known as Diana Olivarez, Diana Ramon and Diana Olivares) ("Olivarez"), is an individual residing in Uvalde, Texas.

28.      At all times relevant to this Complaint, Defendants Bravo and Ramon have owned and operated J&T. At all times relevant to this Complaint, Defendant Olivarez has assisted Bravo and Ramon with J&T's business operations in Texas and Colorado, including with the employment of the J&T Workers, including Plaintiffs.

29.     At all times relevant to this Complaint, Defendant Olivarez acted as an agent of J&T and conducted business on behalf of J&T and on her own behalf in Texas and Colorado.

30.     At all times relevant to this Complaint, J&T Defendants operated J&T and jointly employed Plaintiffs.

31.     At all times relevant to this Complaint, J&T Defendants operated as Farm Labor Contractors, individually and on behalf of Defendant J&T, and conducted farm labor contracting activities in the States of Texas and Colorado.

32.     A Farm Labor Contractor ("FLC") is a person who, for money or other valuable consideration paid or promised to be paid, recruits, solicits, hires, furnishes, and employs migrant agricultural workers. 29 U.S.C. § 1802(7).

33.     FLCs and all those who perform farm labor contracting functions must register with the Wage and Hour Division of the U.S. Department of Labor ("USDOL") before engaging in recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural workers. 29 U.S.C. § 1811.

34.     In the State of Colorado, those who engage in farm labor contracting activities (referred to as "field labor contractors") must first obtain a certificate of registration issued by the Colorado Department of Labor and Employment ("CDLE"). Colo. Rev. Stat. § 8-4-115.[1]

35.     At all times relevant to this Complaint, Defendant J&T had not registered with the USDOL or CDLE and was not authorized to perform farm labor contracting functions in the State of Colorado.

---

[1] "Field labor contractor" is defined as anyone who contracts with an employer to recruit, solicit, hire, or furnish migratory labor for agricultural purposes including sacking, hauling, sorting, and other direct manual labor affecting potatoes, among other crops. Colo. Rev. Stat. § 8-4-101(7).

36.     At all times relevant to this Complaint, Defendants Olivarez, Ramon, and Bravo had not obtained the necessary certification from the USDOL and CDLE,and were not authorized to perform farm labor contracting activities in the State of Colorado.

37.     Despite lacking proper registrations, J&T Defendants were "field labor contractors" and "foreign labor contractors" and thus employers of Plaintiffs and those similarly situated. *See* Colo. Rev. Stat. §§ 8-4-101(7) and (8.5).[2]

38.     Since at least 2022, Defendant Olivarez was in charge of the day-to-day operation of J&T in Colorado and possessed and/or exercised the power and authority to direct, control, and/or supervise Plaintiffs and the other J&T Workers on behalf of Defendant J&T and on her own behalf.

39.     J&T Defendants, individually and/or on behalf of Defendant J&T, recruited foreign workers residing outside of the U.S. and then contracted with Potato Warehouse Defendants for those foreign workers to perform direct manual labor at Potato Warehouse Defendants' potato processing facilities in Monte Vista, Colorado and Center, Colorado.

40.     J&T Defendants recruited, hired, paid, transported, and housed Plaintiffs and other J&T Workers and controlled every aspect of their lives while not working. However, when working at the potato processing facilities, Potato Warehouse Defendants, separately, provided the overall supervision of those Plaintiffs and J&T Workers assigned to their facility.

41.     Defendant MountainKing Potatoes, Inc. is a corporation registered and actively conducting business in the State of Colorado. MountainKing Potatoes, Inc. has a principal office

---

[2] *See supra* note 1. "Foreign labor contractor" is defined as any person who recruits or solicits for compensation a foreign worker who resides outside of the United States in furtherance of that worker's employment in Colorado. Colo. Rev. Stat. § 8-4-101(8.5).

address at 6950 Neuhaus St., Houston, Texas 77061 and a registered agent in Monte Vista, Colorado.

42.　　Defendant Farming Technology Inc. d/b/a MountainKing Potatoes, is a Texas corporation, registered and actively conducting business in the State of Colorado. Farming Technology, Inc. has a principal office address at 840 US Highway 285 N, Monte Vista, CO 81144 and a registered agent in Monte Vista, Colorado.

43.　　Defendant Farming Technology Corporation d/b/a MountainKing Potatoes, is a Texas corporation, registered and actively conducting business in the State of Colorado. Farming Technology Corporation has a principal office address at 6950 Neuhaus St., Houston, Texas 77061 and has a registered agent in Monte Vista, Colorado.

44.　　Defendant Smokin-Spuds, Inc. d/b/a MountainKing Potatoes is a corporation registered and actively conducting business in the State of Colorado. Smokin-Spuds, Inc. has a principal office address in 6950 Neuhaus St., Houston, Texas 77061 and a registered agent in Monte Vista, Colorado.

45.　　At all times relevant to this Complaint, MountainKing Defendants operated and conducted business at MountainKing potato packing warehouses located at 1090 S Miles Street, Center, Colorado and 840 US Hwy 285, Monte Vista, Colorado, where Plaintiffs Rubio Flores and other J&T Workers worked.

46.　　Defendant Alpine Potato Company is a Colorado corporation, actively engaged in business in Colorado. It is currently delinquent on its registration with the Colorado Secretary of State. Its last registered principal address was at 4455 E Lane 10 N, Hooper, Colorado 81136.

47.    At all times relevant to this Complaint, Defendant Alpine operated and conducted business at the Alpine Potato packing warehouse located at 4455 E Lane 10 N, Center, CO 81125 where Plaintiff Angeles Hernandez, Plaintiff Hernandez Jacobo, and other J&T Workers worked.

48.    At all times relevant to this Complaint, MountainKing Defendants and Defendant Alpine each possessed and/or exercised the power and authority to direct, control, and/or supervise the work performed by Plaintiffs and the other J&T Workers at each of their potato packing facilities.

49.    At all times relevant to this Complaint, MountainKing Defendants determined the schedules, work responsibilities, training, and breaks, and also supervised the day-to-day work of Plaintiffs Rubio Flores, and other J&T Workers at their potato packing facilities.

50.    Similarly, at all times relevant to this Complaint, Defendant Alpine determined the schedules, work responsibilities, training, and breaks, and also supervised the day-to-day work of Plaintiffs Angeles Hernandez, Hernandez Jacobo, and other J&T Workers at their potato packing facility.

51.    Potato Warehouse Defendants are persons against whom a right to relief is asserted jointly, severally, or out of the same transaction or series of transactions. Additionally, questions of law or fact common to all Defendants will arise in this action. Potato Warehouse Defendants are named as parties pursuant to Fed. R. Civ. P. 20(a)(2) in that J&T Defendants and Potato Warehouse Defendants, at all relevant times, acted as joint employers with regard to Plaintiffs.

52.    At all times relevant to this Complaint, all Defendants were joint and individual employers of the Plaintiffs within the meaning of 29 U.S.C. §§ 203(d) and 203(g); Colo. Rev. Stat. §§ 8-4-101(5), (6), (7), and (8.5); 20 C.F.R. §§ 655.103(b) and 655.103(c); and 29 C.F.R. § 791.2.

53.     At all times relevant to this Complaint, all Defendants employed employees who engaged in commerce and/or who handled, sold, or worked on goods and materials that had been moved in or produced for commerce.

54.     All Defendants benefited financially from the work performed by Plaintiffs and the other J&T Workers at all times relevant to this Complaint.

## IV.     STATEMENT OF FACTS

55.     For years, J&T Defendants have operated as Farm Labor Contractors, recruiting, hiring, transporting, housing, and paying seasonal and migrant agricultural workers for agricultural employers and others in Texas, Colorado, and other nearby states.

56.     Since at least 2022, on information and belief, J&T Defendants have contracted with Potato Warehouse Defendants to recruit, hire, transport, house, and pay temporary agricultural workers to work at Potato Warehouse Defendants' potato packing facilities in the San Luis Valley of Colorado.

57.     The H-2A visa program is one of the mechanisms J&T Defendants have utilized to acquire a steady supply of agricultural workers for Potato Warehouse Defendants and others.

## THE H-2A VISA PROGRAM

58.     The H-2A Visa program may be utilized by agricultural employers in the U.S. who seek to employ temporary foreign workers ("H-2A workers") once the USDOL certifies that (a) there are not enough U.S. workers to fill the jobs, and (b) the employment of H-2A workers will not adversely affect the wages and working conditions of U.S. workers who are similarly employed. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188(a)(1).

59.     The implementing federal regulations of the H-2A Program require employers to file an *Application for Temporary Employment Certification* ("H-2A Application") with the National Processing Center designated by the Office of Foreign Labor Certification Administrator. 20 C.F.R. § 655.130. The application must include a completed job offer, also referred to as a Job Order or Agricultural Clearance Order, Form ETA-790/790A ("Job Order"), which is used in the recruitment of both U.S. and H-2A workers and is incorporated into the work contract of the employed workers. *Id.*; *see also* 20 C.F.R. § 655.103(b) (defining "job offer," "job order," and "work contract").

60.     The Job Order, must include, among other things, the employer's offer to (a) provide housing that meets program requirements at no cost to the worker; (b) provide meals or cooking facilities; (c) reimburse transportation and subsistence expenses to and from the worker's home; (d) pay workers at least twice monthly or according to the prevailing practice, whichever is more frequent, and pay wages when due; (e) pay the worker the higher of the Adverse Effect Wage Rate ("AEWR"), the prevailing wage, or the amount required by state and federal wage laws; (f) not make deductions from pay for any items purchased primarily for the benefit or convenience of the employer; (g) keep accurate and adequate pay records of the worker's earnings; and (h) provide a written statement on or before each payday indicating, among other things, rate of pay, hours worked, and an itemization of deductions from the worker's wages. 20 C.F.R. §§ 655.122 and 653.501.

61.     The Job Order must also specify all deductions, other than those required by law, that the employer will take from the worker's paycheck. 20 C.F.R. § 655.122(p)(1). The employer may not make deductions that would violate the FLSA. *Id.*

12

62.     In the H-2A Application, submitted after the Job Order, the employer is required to attest, among other things: (a) that it has contractually forbidden any foreign recruiter it directly or indirectly engages from seeking or receiving any compensation from recruited workers; (b) that it will comply with all applicable local, state, and federal laws; and (c) that it will not "intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against . . . any person who has with just cause" exercised their rights under the employment contract. 20 C.F.R. § 655.135.

63.     The terms of employment set forth in an employer's Job Order and H-2A Application, including payment of the higher of the AEWR, the prevailing wage, or the minimum wage required by state and federal wage laws, are incorporated by regulation and by operation of law into the contracts under which workers are employed. 20 C.F.R. § 655.122(q).

64.     The minimum wage requirements of the FLSA apply independently of the H-2A requirements and impose obligations on employers regarding payment of wages. 20 C.F.R. § 655.122(h)(1).

65.     Farm Labor Contractors like J&T Defendants that seek to employ temporary foreign workers through the H-2A Program are classified as H-2A Labor Contractors ("H-2ALCs").

66.     To obtain H-2A workers, H-2ALCs must not only comply with the filing requirements described above, but H-2ALCs must also provide additional information with their H-2A Applications and Job Orders, including but not limited to the name and location of each fixed-site agricultural business to which the H-2ALC expects to provide H-2A workers, the expected beginning and ending dates of when the workers will be provided to each site, a description of the crops and activities the workers are expected to perform at such fixed site, and

a copy of the FLC Certification of Registration, identifying the specific farm labor contracting activities the H-2ALC is authorized to perform as an FLC. 20 C.F.R. § 655.132.

67.     If an employer's Job Order meets the minimum federal regulatory requirements and is otherwise valid, and if it is determined that sufficient U.S. workers are not available to fill the jobs after good faith recruitment efforts, the USDOL provides the temporary labor certification for the number of job opportunities the employer was unable to fill by U.S. workers and then the employer petitions the U.S. Citizenship and Immigration Services ("USCIS") for the H-2A visas. The employer then selects prospective H-2A workers who are outside the U.S. who then must apply for an H-2A visa with the U.S. Department of State at a U.S. Embassy or Consulate abroad and then seek admission to the U.S. at a U.S. port of entry.

68.     H-2A workers are only authorized to work for the specific employer who petitioned for their H-2A visa.

**J&T DEFENDANTS' USE OF THE H-2A VISA PROGRAM**

69.     For 2022, J&T Defendants submitted a Job Order (the "2022 J&T Job Order") and H-2A Application (the "2022 J&T H-2A Application") as an H-2ALC, seeking permission to fill ninety-nine (99) Farmworker, Laborer positions with H-2A workers with dates of need ranging from September 21, 2022, through July 10, 2023.[3]

---

[3] In 2023, J&T Defendants submitted two (2) additional Job Orders and H-2A Applications (the "2023 J&T Job Orders and H-2A Applications"). The first 2023 J&T Defendants' Job Order and H-2A Application listed the dates of need as ranging from May 1, 2023, through July 20, 2023, and sought at least 99 H-2A workers. The second 2023 J&T Defendants' Job Order and H-2A Application stated dates of need ranging from September 21, 2023, through July 13, 2024, and also sought at least 99 H-2A workers.

70.     The 2022 J&T Job Order stated that the H-2A workers would be employed to perform labor at six (6) different fixed site farms in and around Uvalde, Texas, where they would be picking and planting various crops. It further stated that the H-2A workers' job conditions would satisfy the applicable regulations discussed above.

71.     Defendant Bravo, acting on behalf of J&T Harvesting LLC, signed the 2022 J&T Job Order and H-2A Application and all additional Job Orders and H-2A Applications as the prospective employer and as such, represented that J&T would comply with all legal obligations of an employer of H-2A workers, including payment of the proper wage.

72.     On information and belief, at the time they signed the 2022 J&T H-2A Application and the 2023 J&T H-2A Applications, J&T Defendants knew the H-2A workers they sought would not be working at the fixed-site farms listed on any of the job orders and would instead be furnished to the Potato Warehouse Defendants in Colorado.

73.     From January 1, 2022, through December 31, 2022, the AEWR for non-range H-2A workers in Colorado was $15.58 per hour. The Colorado minimum wage in 2022 was $12.56 per hour.

74.     From January 1, 2023, through December 31, 2023, the AEWR for non-range H-2A workers in Colorado was $ 16.34 per hour. The Colorado minimum wage in 2023 was $ 13.65 per hour.

75.     For all relevant periods, the federal minimum wage was $7.25 per hour.

76.    The 2022 J&T Job Order and H-2A Application were approved by the USDOL and then used to petition USCIS for the H-2A visas for the prospective H-2A workers, including Plaintiffs.[4]

77.    Each of the Plaintiffs and those similarly situated filled a position requested in the 2022 J&T Job Order and H-2A Application.

78.    The 2022 J&T Job Order for the positions filled by Plaintiffs and the other J&T Workers included each of the required elements described in Paragraphs 60 and 61 and 20 C.F.R. §§ 655.122 & 653.501, including payment of the proper wage, free and appropriate housing, transportation and board, timely pay, and only proper deductions.

79.    The 2022 J&T H-2A Application for the positions filled by Plaintiffs and the other J&T Workers included each of the required elements described in Paragraph 62 and 20 C.F.R. § 655.135 including commitments to contractually forbid any foreign recruiter from seeking or receiving compensation from recruited workers, to follow all applicable state and federal laws, and not to retaliate against workers exercising their contractual rights.

80.    In approving the 2022 J&T Job Order and H-2A Application, the USDOL and USCIS relied upon the false statements contained therein, including the representations that Plaintiffs and the other J&T Workers would be employed by properly registered FLC Employers, that they would be working at a fixed site farm in Uvalde, Texas, and that their job conditions would comply with the law.

---

[4] On information and belief, the two (2) additional Job Orders and H-2A Applications submitted by J&T Defendants to USDOL in 2023 discussed above were also approved and used to secure H-2A visas in the same manner as in 2022.

**RECRUITMENT OF PLAINTIFFS**

81.    In order to furnish various fixed-site employers, including the Potato Warehouse Defendants, with temporary agricultural workers, J&T Defendants directed and utilized various agents to recruit foreign workers for the 2022 J&T Job Order, including Plaintiffs.

82.    By and through these agents, J&T Defendants required Plaintiffs and others similarly situated to—as a condition of their employment, and in violation of H-2A regulations (20 C.F.R. § 655.135(j))—pay recruitment fees to J&T Defendants' agents.

83.    Since at least 2022, J&T Defendants utilized agents Carlos Hernandez and Pabel Juan Martinez to recruit prospective H-2A workers, including Plaintiffs, to work for Defendants.

84.    Carlos Hernandez and Pabel Juan Martinez are from Tamazunchale, San Luis Potosi, Mexico, the same area where some of the Plaintiffs and the other J&T Workers were recruited from.

85.    Carlos Hernandez and Pabel Juan Martinez are agents of J&T Defendants and held themselves as such. At all times relevant to this Complaint, Carlos Hernandez and Pabel Juan Martinez had actual and apparent authority to act on behalf of J&T Defendants.

86.    J&T Defendants, through their agents Carlos Hernandez, and Pabel Juan Martinez, enticed Plaintiffs to pay recruitment and other fees with fraudulent and deceptive promises regarding the number of hours to be worked and the wages Plaintiffs would make for those promised hours.

87.    These fraudulent and deceptive promises included but were not limited to, promises of abundant work in agriculture in Texas, pay of at least $ 15.00 per hour worked, and free housing that would comply with local, state, and federal law.

17

88.     In July 2022, while in Tamazunchale, San Luis Potosi, Mexico, Plaintiff Rubio Flores was recruited by Pabel Juan Martinez, through Juan Martinez's brother, Osvaldo.

89.     Pabel Juan Martinez offered, through his brother Osvaldo Juan Martinez, Plaintiff Rubio Flores a job in the U.S. working in agriculture for nine months and promised that the pay was good.

90.     Plaintiff Rubio Flores relied on the terms of the job offer from J&T's agent, Pabel Juan Martinez, in accepting the job.

91.     Osvaldo Juan Martinez then informed Plaintiff Rubio Flores that Osvaldo had to pay 6,000 pesos (or approximately $299.03 USD[5]) to J&T Defendants to ensure the job for Plaintiff Rubio Flores. Accordingly, Plaintiff Rubio Flores promised to pay Osvaldo back once he got to the U.S. and started working. Osvaldo told Plaintiff Rubio Flores that he would need to get together approximately 20,000 pesos (approximately $996.76) to cover the cost of his travel to the United States for the job.

92.     Plaintiff Rubio Flores had 10,000 pesos (approximately $498.38) in savings and took out a loan to secure the rest. He was charged 2,000 pesos (approximately $99.68) in interest on the loan.

93.     Plaintiff Angeles Hernandez met Defendant Olivarez in or around May 2022, while he was working in Uvalde, Texas for another H-2A employer.

---

[5] For the month of September 2022, the average exchange rate was 20.065 Mexican pesos to one United States dollar. *US Dollar (USD) To Mexican Peso (MXN) Exchange Rate History for 2022*, Exchange-Rates.org, https://www.exchange-rates.org/exchange-rate-history/usd-mxn-2022 (last visited Oct. 15, 2024).

94.     Defendant Olivarez recruited Plaintiff Angeles Hernandez to come work for her company after his visa expired in July 2022. Defendant Olivarez offered him better pay and more hours and said that she would apply for a new H-2A visa for him.

95.     Based on Defendant Olivarez's representations, Plaintiff Angeles Hernandez accepted the job offer.

96.     Defendant Olivarez instructed Plaintiff Angeles Hernandez to provide his information to her agent, Carlos Hernandez, so that Plaintiff Angeles Hernandez could return to Mexico to get his new H-2A visa and then return to the United States to work for her.

97.     Plaintiff Angeles Hernandez complied with Defendant Olivarez's instructions and gave his information to Carlos Hernandez. Carlos Hernandez informed Plaintiff Angeles Hernandez that he will need to pay Carlos $400 to return. Plaintiff Angeles Hernandez agreed and then Carlos Hernandez instructed him to go to the Hotel El Mexicano in Monterrey, Nuevo Leon, Mexico around September 28, 2022 to get his H-2A Visa from the U.S. Consulate located in Monterrey.

98.     In or around September 2022, J&T agent Pabel Juan Martinez recruited Plaintiff Hernandez Jacobo to work for Defendants. Plaintiff Hernandez Jacobo's sister-in-law, who lived in Tamazunchale, San Luis Potosi, Mexico, put him in touch with Juan Martinez while Plaintiff Hernandez Jacobo was in his hometown of Veracruz, Mexico.

99.     Pabel Juan Martinez informed Plaintiff Hernandez Jacobo that he could get him a visa to work in the U.S. in agriculture. However, because it was getting close to the date all J&T's recruits would be traveling from Tamazunchale to Monterrey to get their visas, Plaintiff Hernandez Jacobo would have to pay Juan Martinez 6,000 pesos (approximately $299.03) the following day.

Juan Martinez told Plaintiff Hernandez Jacobo that he did not know all of the details of the job but said that it would be just like the previous jobs Plaintiff Hernandez Jacobo had through the H-2A Program.

100.    Based on these representations, Plaintiff Hernandez Jacobo accepted the job with J&T Defendants. Pabel Juan Martinez instructed Plaintiff Hernandez Jacobo to take the 6,000 pesos (approximately $299.03) to Juan Martinez's father's house in Tamazunchale, because Juan Martinez was in the United States at the time.

101.    Promising that he would pay her back as soon as he arrived in Tamazunchale, Plaintiff Hernandez Jacobo asked his sister-in-law to take 6,000 pesos (approximately $299.03) to Pabel Juan Martinez's father as instructed. Plaintiff Hernandez Jacobo's sister-in-law completed this request.

102.    Plaintiff Hernandez Jacobo then traveled to Tamazunchale, reimbursed his sister-in-law, and met up with the other recruits who were getting ready to travel to Monterrey to apply for the H-2A visas to work with J&T Defendants.

103.    On information and belief, J&T agents Pabel Juan Martinez and Carlos Hernandez recruited many of the J&T Workers in 2022 and subsequent years.

104.    On information and belief, J&T Defendants hired an agency that works out of Hotel El Mexicano in Monterrey to assist Plaintiffs and the other individuals they recruit with the H-2A visa application process, including scheduling and preparing for interviews at the U.S. consulate, and all related visa matters.

**ADDITIONAL PRE-EMPLOYMENT COSTS & EXPENSES INCURRED BY PLAINTIFFS**

105.    On or around late September 2022, Plaintiffs Rubio Flores and Hernandez Jacobo were each told by Pabel Juan Martinez that they needed to travel from Tamazunchale to Monterrey to get their H-2A visas on or around September 27, 2022.

106.    Plaintiffs Rubio Flores and Hernandez Jacobo each paid approximately 800 pesos (approximately $39.87) for the bus that took them from Tamazunchale to Monterrey where they were to obtain their H-2A visas.[6]

107.    Around this same time, Plaintiff Angeles Hernandez paid approximately 2,000 pesos (approximately $99.68) for his bus transportation from Uvalde, Texas to the Hotel El Mexicano near the U.S. Consulate in Monterrey to attend the interview for his new H-2A visa.

108.    On or around September 27, 2022, Plaintiffs arrived at the Hotel El Mexicano in Monterrey as instructed by J&T Defendants.

109.    Plaintiffs and the other J&T Workers were put into hotel rooms of six to eight men per room. While at Hotel El Mexicano, agents helped Plaintiffs and other recruits with the visa applications and the consular processing to get their H-2A visas.

110.    Plaintiffs and the other J&T Workers stayed at Hotel El Mexicano from approximately September 27, 2022, through approximately October 3, 2022.

111.    On information and belief, all J&T Workers paid for their stay at the Hotel El Mexicano in Monterrey. Plaintiffs paid the following amounts:

---

[6] Plaintiff Hernandez Jacobo traveled by bus from Veracruz to Tamazunchale, San Luis Potosi which cost him an additional 700 pesos (approximately $34.89). Plaintiff Hernandez Jacobo met Plaintiffs Rubio Flores for the first time in Tamazunchale when they traveled by bus together to Monterrey.

    a.  Plaintiff Rubio Flores paid 1,100 pesos (approximately $54.82).

    b.  Plaintiff Angeles Hernandez paid 1,200 pesos (approximately $59.81).

    c.  Plaintiff Hernandez Jacobo paid 1,100 pesos (approximately $54.82).

112.    On information and belief, all J&T Workers paid the visa processing fees and also paid for the transportation from Monterrey to Uvalde, Texas. In regard to the named Plaintiffs:

    a.  Plaintiff Rubio Flores estimates that he paid approximately 3,800 pesos (or $189.38).

    b.  Plaintiff Angeles Hernandez estimates that he paid approximately 3,000 pesos (or $149.51).

    c.  Plaintiff Hernandez Jacobo estimates that he paid approximately 3,000 pesos (or $149.51).

113.    Plaintiffs and the other J&T Workers also paid for their food and incidental expenses throughout their stay in Monterrey to obtain their H-2A visas.

114.    Plaintiffs Rubio Flores and Hernandez Jacobo estimate that they each spent a total of at least 20,000 pesos (approximately $996.76) for all of the above-described expenses and costs, including food and incidentals.

115.    Plaintiff Angeles Hernandez estimates that he spent approximately $650 just on food and incidentals during this time period.

116.    In violation of the H-2A Program regulations, Plaintiffs were never reimbursed for any of the above-described fees and costs associated with obtaining their visas and for the transportation from the place of recruitment.

117.    On information and belief, none of the similarly situated workers who were recruited by J&T Defendants through the H-2A Program and worked or are currently working for Defendants were reimbursed for the above-described fees and costs associated with obtaining their visas and for the transportation from the place of recruitment.

118.    As part of the visa application process, J&T Defendants' agents at the Hotel El Mexicano gave Plaintiffs and the other J&T Workers paperwork to sign.

119.    J&T Defendants' agents at the Hotel El Mexicano required Plaintiffs to sign a form that stated that they did not have to pay anyone in order to get the H-2A visa. The agents told Plaintiffs and the other J&T Workers that they would not receive their visas if they did not sign the form.

120.    Plaintiffs were each shown the employment contract for the job and recall that it stated that they would each be working in Uvalde, Texas, would receive $13.88 per hour or whatever the applicable wage was at that time, and would be provided with housing for no cost.

## LIVING AND WORKING CONDITIONS IN COLORADO

121.    Once Plaintiffs' and the other J&T Workers' H-2A visas were issued, J&T Defendants put Plaintiffs and the other J&T Workers, approximately sixty (60) other individuals, on a bus that took them to the Mexico/U.S. border and then into Texas. They arrived at a hotel in Uvalde, Texas on or around October 4, 2022.

122.    Plaintiffs and the other J&T Workers stayed approximately one night at a hotel in Uvalde, Texas and then were taken to Defendants Bravo and Ramon's house also in Uvalde, Texas.

123.    Plaintiffs met Defendant Bravo and J&T agent Carlos Hernandez at the house in Uvalde, Texas. Plaintiffs also met another agent of J&T Defendants named Angel.

124.    In addition to the estimated sixty (60) J&T Workers that travelled to Uvalde from Monterrey the day before, other men and women were also brought to Defendant Bravo's house. Plaintiffs estimate that there were approximately seventy-five (75) recruits or employees of J&T Defendants that passed through that house that day.

125.    After waiting around all day at the house, J&T agent Angel began dividing up the J&T Workers into different groups depending on who had recruited them and told them they would be going to work in different locations.

126.    Defendant Bravo gave Plaintiffs and the other J&T Workers more documents to sign that Plaintiffs understood to be related to their new work assignment in Colorado.

127.    Plaintiffs Rubio Flores, Hernandez Jacobo, and approximately fifty-five (55) other J&T Workers were then instructed to board a bus that was headed to Colorado where they would be working in potatoes.

128.    Plaintiff Angeles Hernandez was instructed to get in a van with Carlos Hernandez and several other J&T Workers that was also headed to Colorado.

129.    A separate group of workers were taken to work in Houston by J&T agent Angel.

130.    Before leaving Uvalde, Texas, Plaintiff Rubio Flores and a few other J&T Workers asked Carlos Hernandez why they were not staying in Uvalde to work because that was what their contracts said. Hernandez replied that staying in Uvalde was not an option and they had no choice but to get on the bus or van headed to Colorado. Carlos Hernandez then warned them to stop complaining.

131.     On the bus with Plaintiffs Rubio Flores and Hernandez Jacobo, were other J&T Workers who had been issued the H-2A visas at the same time as Plaintiffs as well as some women whose H-2A visas had expired.

132.     The bus and van travelling with Plaintiffs first stopped in New Mexico to drop off some of the workers and to pick up others and then continued to Colorado. Plaintiffs understood Carlos Hernandez to be in charge of all of the J&T Workers in the bus and the van who went to Colorado.

133.     J&T Defendants did not provide food or water to Plaintiffs or the other J&T Workers for the entirety of the trip from the U.S./Mexico border to Colorado which took them several days. Those that had money were able to buy their own food and water, others either borrowed money or went without.

134.     Once in Colorado, Carlos Hernandez took Plaintiffs and approximately sixty (60) other J&T Workers to a hotel for one night in Alamosa, Colorado. The next day Carlos Hernandez took all the J&T Workers, including Plaintiffs, to a run-down motel in Del Norte, Colorado called the Country Family Inn located at 1050 Grand Avenue, Del Norte, Colorado 81132.

135.     Carlos Hernandez forced all the J&T Workers, including Plaintiffs, to stay at the Country Family Inn despite there not being enough rooms and mattresses for everyone. The men and women were put in different rooms.[7] The men, including Plaintiffs, were packed into the rooms – eight men to one room with just a mattress and a box spring, which they separated to provide slightly more comfort than sleeping on the floor. Some of the J&T Workers were forced to sleep in the closed down restaurant attached to the motel.

---

[7] On information and belief, some of the women were taken elsewhere to stay.

136.    The motel rooms were in serious disrepair, the carpets were wet and dirty, the mattresses were old and stained, and the smell was unbearable.

137.    The electricity at the motel went out frequently and there was no heat. Plaintiffs and the other J&T Workers were not given sufficient bedding and were often times cold at night.

138.    Plaintiffs stayed in the Country Family Inn for approximately three weeks, until on or around October 25, 2022.

139.    While at the run-down motel, J&T Defendants were still not providing any food or water to Plaintiffs and the other J&T Workers.  Plaintiffs and the other J&T Workers pooled their money together to buy cheap canned food that did not need to be cooked from the nearby dollar store that they were allowed to walk to. They shared the food among themselves, eating one meal a day to try to make their money and food last.

140.    At one point Carlos Hernandez offered loans of $100 each to the J&T Workers, including Plaintiffs, to buy food. Carlos Hernandez later deducted the loan from the workers' first payment of wages.

141.    On or around October 17, 2022, Carlos Hernandez and Pabel Juan Martinez divided Plaintiffs and the other J&T Workers into groups and sent them to work at Potato Warehouse Defendants' potato packing facilities in the area.

142.    Carlos Hernandez and/or Pabel Juan Martinez assigned Plaintiff Rubio Flores to the group that was taken to work at MountainKing Defendants' potato packing facility in Center, Colorado. Carlos Hernandez was in charge of this group.

143.    Carlos Hernandez and/or Pabel Juan Martinez put Plaintiffs Angeles Hernandez and Hernandez Jacobo in a group with approximately eight (8) other J&T Workers to work at

Defendant Alpine's potato packing facility in Center, Colorado. They put Luis Alberto Hernandez, another J&T Worker, in charge of this group.[8]

144.    Carlos Hernandez and/or Pabel Juan Martinez assigned other J&T Workers to a group that was taken to work at the MountainKing Defendants' other potato packing facility in Monte Vista, Colorado. Pabel Juan Martinez was in charge of this group.

145.    Carlos Hernandez and/or Pabel Juan Martinez were the main representatives of J&T Defendants in charge of all of the J&T Workers in Colorado, including Plaintiffs.

146.    On or around October 25, 2022, Defendant Olivarez moved a group of approximately thirty (30) J&T Workers, including Plaintiffs, from the Country Family Inn in Del Norte, Colorado to a house in Center, Colorado.

147.    The house in Center, Colorado where Plaintiffs and the other J&T Workers were moved to was completely unfurnished with no beds or furniture, and was in serious disrepair.

148.    Defendant Olivarez made some of the J&T Workers clean and fix up the house before all thirty (30) men moved in.

149.    The house had five bedrooms and two bathrooms. Two sets of bunk beds were put in each room and there were also mattresses put in the other living spaces of the house. All the J&T Workers residing there, including Plaintiffs, had to buy their own bedding.

150.    Defendant Olivarez informed the J&T Workers, including Plaintiffs, that they would each be charged $100 per week for the housing which J&T Defendants began deducting from their wages.

---

[8] Among other things, Luis Alberto Hernandez drove the J&T Workers to and from the Alpine potato packing facility for work. He reported to Carlos Hernandez and Pabel Juan Martinez.

151.    Plaintiff Angeles Hernandez, Hernandez Jacobo, and a few others found a small apartment nearby and attempted to rent it from the same landlord who was renting the house to J&T Defendants. But Defendant Olivarez intervened and took over the rental agreement of that separate living space and required them to pay J&T Defendants rent instead of the landlord. As a result, the men ended up paying approximately twice the amount of rent the landlord was originally going to charge them.

**UNLAWFUL PAY PRACTICES**

152.    When Plaintiffs and the other J&T Workers began working at the potato packing facilities of Potato Warehouse Defendants, their work hours varied each week. Plaintiffs estimate that their weekly work hours for Defendants were as follows:

a.  At MountainKing Defendants' potato packing facility in Center, Colorado, Plaintiff Rubio Flores worked seven to eight hours per day, approximately five days per week from on or around October 17, 2022, until approximately November 17, 2022.

b.  At Defendant Alpine's potato packing facility, Plaintiffs Angeles Hernandez and Hernandez Jacobo usually worked about six to eight hours a day, five days a week from on or around October 17, 2022, until approximately November 17, 2022.

c.  The J&T Workers who worked at MountainKing Defendants' potato packing facility in Monte Vista, Colorado, worked approximately seven to eight hours a day, four days a week from on or around October 17, 2022, until approximately December 28, 2022.

153.    When Plaintiffs began working at Potato Warehouse Defendants' facilities, they understood that they were supposed to receive over $15.00 per hour as their wages, but that was not what they received.

154.    Plaintiffs were also not paid directly by Potato Warehouse Defendants. Potato Warehouse Defendants gave Plaintiffs' wages to Defendant Olivarez. Defendant Olivarez then took a portion of Plaintiffs' and the other J&T Workers' wages for herself and J&T Defendants, as well as deductions for rent, before passing on any of the wage payments to Plaintiffs and the other J&T Workers.

155.    On information and belief, the first time Defendants paid Plaintiffs and the other J&T Workers for any of their work was on or around October 26, 2022. The payment was only for their first two days of work, on or around October 17 and 18, 2022. Plaintiffs received the following amounts from J&T Defendants:

    a.    Plaintiff Rubio Flores received approximately $280 in cash for his first payment of wages but was deducted $100 for the loan from Carlos Hernandez for food earlier that month.[9]

    b.    Plaintiffs Angeles Hernandez and Hernandez Jacobo each received approximately $132 in cash for each of their first payment of wages.[10]

---

[9] Plaintiff Rubio Flores worked approximately twenty (20) hours total on October 17 and 18, 2022 (ten hours each day). On information and belief, the other J&T Workers working at MountainKing Defendants' potato packing facilities in Center and Monte Vista also worked approximately 20 hours total on October 17 and 18, 2022 and received a cash payment of $280 the same time as Plaintiff Rubio Flores. Those that had also borrowed from Carlos were also deducted the $100.

[10] Plaintiffs Angeles Hernandez and Hernandez Jacobo as well as the other J&T Workers working at Defendant Alpine's potato packing facility worked very few hours on October 17 and 18, 2022.

156.    After the first payment of wages, Plaintiffs and other J&T Workers were paid portions of their wages infrequently, and in lesser amounts than promised due to Defendants' unlawful deductions. The subsequent wage payments Plaintiffs actually received from Defendants are as follows:

a.    On or around November 1, 2022, Defendant Olivarez paid Plaintiff Rubio Flores approximately $467 in cash. The pay statement stated that the amount paid was for hours worked during the period of October 19 through October 21, 2022, at $14.00 per hour. Defendant Olivarez took out $100 from the total amount on the pay statement to pay for his housing.

b.    On or around November 1, 2022, Defendant Olivarez paid Plaintiff Angeles Hernandez $546 in cash. The pay statement stated that the amount paid was for 46:13 hours worked during the period of October 19 through October 21, 2022, at $14.00 per hour. Defendant Olivarez took out $100 from the total amount on the pay statement to pay for his housing.

c.    On or around November 1, 2022, Defendant Olivarez paid Plaintiff Hernandez Jacobo $546 in cash. The pay statement stated that the amount paid was for 46:13 hours worked during the period of October 19 through October 21, 2022. Defendant Olivarez took out $100 from the total amount on the pay statement to pay for his housing.

157.    On information and belief, Defendant Olivarez required all J&T Workers, including Plaintiffs, to pay her $100 immediately after she paid them their wages to pay for their housing.

158.    Plaintiffs were not paid the federal minimum wage or Colorado minimum wage for all hours worked for Defendants. Plaintiffs report the following unpaid wages:

    a.    Plaintiff Rubio Flores estimates that he is owed approximately three additional weeks of wages, in addition to the amounts that were unlawfully withheld from his earnings.

    b.    Plaintiff Angeles Hernandez estimates that he is owed approximately three additional weeks of wages, in addition to the amounts that were unlawfully withheld from his earnings.

    c.    Plaintiff Hernandez Jacobo estimates that he is owed approximately three additional weeks of wages in addition to the amounts that were unlawfully withheld from his earnings by Defendants.

159.    On information and belief, those similarly situated who were recruited by J&T Defendants and who worked or are currently working for Defendants have not received at least the federal minimum wage nor the Colorado minimum wage for all hours worked.

**J&T DEFENDANTS' SYSTEM OF CONTROL AND CLIMATE OF FEAR**

160.    J&T Defendants engaged in a system of control and created a climate of fear to keep Plaintiffs and J&T Workers to continue working for Defendants. J&T Defendants' tactics included manipulation, threats, intimidation, and isolation to create a climate of fear among Plaintiffs and J&T Workers.

161.    For example, Plaintiffs were oftentimes hungry and without money to buy food.

162.    Defendants provided minimal, if any, provisions to Plaintiffs during their first several weeks in the U.S. during which time Plaintiffs were running out of the money they had brought and were not working or receiving wages to buy themselves food.

163.    While everyone was staying at the run-down motel in Del Norte and after some of the J&T Workers who came with Plaintiffs escaped, Carlos Hernandez told Plaintiffs and the other remaining J&T Workers that Defendant Olivarez wanted them to turn in their passports to prevent them from leaving.

164.    On information and belief, many of the J&T Workers gave their passports to either Carlos Hernandez or Pabel Juan Martinez.

165.    Carlos Hernandez told Plaintiffs and the other J&T Workers that they needed to give their passports to the person in charge of their group—which was either Carlos Hernandez, Pabel Juan Martinez, or Luis Alberto Hernandez.

166.    Carlos Hernandez told Plaintiffs and the other J&T Workers that Defendant Olivarez was reporting the people who had fled to immigration. He explained that they would be apprehended and never allowed to return to the U.S.

167.    Plaintiffs understood what Carlos Hernandez said to be a threat that they would also be reported to immigration and barred from returning to the United States if they tried to leave.

168.    At all times relevant to this Complaint, Plaintiffs felt like they and the other J&T Workers were always being watched by J&T Defendants through their agents, including but not limited to Carlos Hernandez and Pabel Juan Martinez.

169.    For example, Plaintiffs and the other J&T Workers did not have their own means of transportation. They were forced to depend on J&T Defendants' agents for transportation to and from work every day.

170.    Further, they were not allowed to go anywhere without express permission from Carlos Hernandez or Pabel Juan Martinez.

171.    Carlos Hernandez and Pabel Juan Martinez told Plaintiffs and the other J&T Workers they were not allowed to interact with the local workers at the potato packing facilities nor the community members around the town.

172.    After some community members went to the motel in Del Norte to visit the J&T Workers, Plaintiffs and the other J&T Workers were told by Carlos Hernandez that they should not talk to the people who come to try to visit them.

173.    When Defendant Olivarez came to Colorado to pay Plaintiffs and the other J&T Workers on or around November 1, 2022, she told them all as a group that she had heard that some community members had come to visit the workers and she warned them not to speak to them and to deny them from visiting again.

174.    Plaintiffs took this warning seriously and believed Defendant Olivarez and J&T Defendants or their agents would cause them harm if they did not comply, so they told the community members not to visit the J&T Worker housing anymore.

175.    During that same visit, Defendant Olivarez told the group that after coming to the U.S. with her company three times, the company would help them get their legal permanent residency status.[11]

176.    On several occasions, Plaintiffs were told directly and as a group by Defendant Olivarez and Carlos Hernandez that they would be in trouble with immigration if they left their employment with Defendants and that they would never be allowed back into the U.S. again.

177.    Plaintiffs were each independently warned that there would also be consequences if they continued to ask the wrong questions, complain, or cause problems for J&T Defendants.

178.    Plaintiffs felt intimidated and scared by Defendant Olivarez, Carlos Hernandez, and Pabel Juan Martinez and believed their threats and did as they said.

179.    Plaintiffs feared J&T Defendants and what they and their agents might do if Plaintiffs attempted to escape or if they looked for help.

180.    Plaintiffs were each independently concerned about maintaining their lawful status in the United States and believed the threats made by J&T Defendants regarding the immigration consequences if they left. The ability to continue participating in the H-2A Program was the utmost priority for Plaintiffs. In Mexico, they had not been able to find work that paid enough to provide for themselves and their families.

181.    Each Plaintiff incurred substantial debt in order to get the job for Defendants and needed to pay it back.

---

[11] The H-2A Program does not provide a path to legal permanent residency in the U.S. or U.S. citizenship.

182.    Each Plaintiff had financial obligations in Mexico, such as supporting their families or paying for their children's school tuition, and therefore maintaining employment was a high priority for the Plaintiffs.

183.    J&T Defendants were aware that Plaintiffs and the other J&T Workers incurred debt to get their jobs for Defendants. This is in part because they charged or authorized the recruitment fees Plaintiffs paid. On information and belief, the other J&T Workers paid similar recruitment fees.

184.    For several weeks, Plaintiffs were afraid that they would be reported to immigration if they tried to leave. They did not know anyone who could help them, and they did not have any money.

185.    All of J&T Defendants' actions and threats described above made Plaintiff Rubio Flores believe he had no choice but to stay and work for Defendants.

186.    All of J&T Defendants' actions and threats described above made Plaintiff Angeles Hernandez believe he had no choice but to stay and work for Defendants.

187.    All of J&T Defendants' actions and threats described above made Plaintiff Hernandez Jacobo believe he had no choice but to stay and work for Defendants.

**POTATO WAREHOUSE DEFENDANTS' KNOWLEDGE OF PLAINTIFFS' FORCED LABOR**

188.    Plaintiffs were initially afraid to speak to the local workers at the potato packing facilities because of the warnings they had received from J&T Defendants and their agents. But after some time, Plaintiffs and on information and belief, other J&T Workers began sharing what they were going through.

189.    Some of the local workers who worked for Potato Warehouse Defendants, including supervisors, knew that the J&T Workers, including Plaintiffs, were not receiving their pay and were hungry and without food, money, and proper clothing.

190.    At various times in October and November 2022, the local workers, including supervisors, gave the J&T Workers, including Plaintiffs, food, clothing, bedding, and even money.

191.    Some of the local workers at Defendant Alpine's potato packing facility saw that Plaintiffs and other J&T Workers did not bring much food for lunch and, at times, brought them food. A supervisor even gave Plaintiffs and the other J&T Workers $100 to split among themselves to buy food.

192.    Plaintiff Hernandez Jacobo told a supervisor at Defendant Alpine's potato packing facility, through an interpreter, that he and the other J&T Workers working there had not been paid for their work for the past several weeks. He also told the supervisor about the bad conditions of the housing, all of the fees he had to get paid to get the job, and the lack of food.

193.    Around or in October and November 2022, on information and belief, at least one supervisor who worked for MountainKing Defendants received multiple complaints from J&T Workers working at MountainKing Defendants' potato packing facilities that they were not getting paid for their work. At least one MountainKing supervisor reported to their superiors that J&T Workers were not receiving their wages for the work they were performing at MountainKing Defendants' potato packing facilities.

194.    Among those who complained was Plaintiff Rubio Flores. He complained about how Defendant Olivarez and J&T Defendants were violating the terms of his employment contract by not paying him for his work and by charging him for his housing.

195.    Shortly after Plaintiff Rubio Flores complained to the MountainKing supervisor, he was contacted by Defendant Olivarez who informed him that the owners of MountainKing had been contacted by a supervisor inquiring about the J&T Workers receiving their pay. Defendant Olivarez reprimanded Plaintiff Rubio Flores and warned him to stop talking to everyone and causing problems.

196.    At various times during all times relevant to this Complaint and on information and belief, many of the J&T Workers told the local workers and supervisors at the potato packing warehouses about the debt they incurred to get the H-2A jobs, the lack of food, bad housing conditions, threats of immigration consequences, isolation and warnings not to speak to anyone outside of J&T and /or their inability to leave their employment.

### HARM TO PLAINTIFFS

197.    For more than six weeks, Plaintiffs suffered great fear, anxiety, stress, humiliation, hunger, and emotional distress while working for Defendants.

198.    Plaintiff Rubio Flores was afraid, stressed, hungry, cold, anxious and extremely worried about the debt he had incurred and how he was going to pay it back. He had trouble sleeping and was depressed.

199.    Plaintiff Angeles Hernandez was also afraid, angry and anxious that he was being exploited, manipulated and that his freedom had been taken by J&T Defendants. He was hungry and cold and would get headaches frequently while working for Defendants.

200.    Plaintiff Hernandez Jacobo felt trapped and helpless. He was hungry, he had no money. He was in debt and his family in Mexico needed him but there was nothing he could do.

201.    Finally, at some point in November 2022, Plaintiffs learned more about their rights and the resources that may be available to help them.

202.    On or around November 17, 2022, Plaintiffs Rubio Flores, Angeles Hernandez, and Hernandez Jacobo, secretly gathered their belongings and went to a safe location.

203.    Plaintiffs feared for their personal safety after they escaped and felt they were still being monitored. Plaintiffs continue to fear that J&T Defendants and their agents will retaliate against them for enforcing their rights.

204.    In fact, Plaintiff Angeles Hernandez was contacted by Defendant Olivarez and received several messages from J&T agent, Carlos Hernandez, after Plaintiffs had escaped.

205.    Plaintiffs continued to suffer great fear, humiliation, emotional distress and other types of harm after they escaped.

206.    Specifically, as a result of his experiences working for Defendants, Plaintiff Rubio Flores continued to suffer emotionally and physically. For several months, he had trouble eating and had lost significant weight and was suffering with hair loss and skin irritation. He has suffered with depression, difficulty sleeping and feelings of profound sadness.

207.    Similarly, as a result of his experiences working for Defendants, Plaintiff Angeles Hernandez suffered emotionally and physically. He felt manipulated, exploited, and isolated. Plaintiff Angeles Hernandez felt trapped, like he no longer was a free man. He suffered from headaches as a result of these events.

208.    As a result of his experiences working for Defendants, Plaintiff Hernandez Jacobo suffered physically and emotionally. Plaintiff Hernandez Jacobo became malnourished while working for Defendants and it took considerable time for his body to recover. Since he left,

Plaintiff Hernandez Jacobo has suffered from anxiousness, depressed mood, feelings of isolation, and detachment.

209.   On information and belief, Defendants continued to employ similarly situated workers recruited by J&T Defendants to work for Defendants until at last March 31, 2024.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

210.   Plaintiffs Rubio Flores, Angeles Hernandez, and Hernandez Jacobo, bring their First Claim for Relief under the Fair Labor Standards Act as a collective action, pursuant to 29 U.S.C. § 216(b), for themselves and on behalf of all similarly situated persons who were or will be employed by Defendants under the auspices of J&T Harvesting, Inc. or J&T Defendants.

211.   The relevant time period dates back three years from the date on which this Complaint was filed and continues forward through the date of judgment because the FLSA provides a three-year statute of limitations for claims of willful violations brought under the Act. 29 U.S.C. § 255(a).

212.   All potential § 216(b) Class Members are similarly situated because they were contracted to work for Defendants by J&T Defendants and are or were subject to Defendants' common policy of deducting items from wages impermissibly and causing wages to fall below the required minimum wage and generally, failing to pay minimum wages.

213.   All Defendants were aware that the FLSA requires them to pay at least the minimum wage to workers and that an employer may not deduct from employee wages, costs and expenses which primarily benefit the employer if such deductions drive wages below the minimum wage.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.***
All Plaintiffs Against All Defendants

214.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

215.    Plaintiffs assert this count on their own behalf and on behalf of all others similarly situated ("J&T Workers"). 29 U.S.C. § 216(b).

216.    Plaintiffs and other J&T Workers were "employees" as that term is defined by the FLSA. 29 U.S.C. § 203(e).

217.    Defendants "employed" Plaintiffs and other J&T Workers as that term is defined by the FLSA. 29 U.S.C. § 203(g).

218.    Defendants were Plaintiffs' and other J&T Workers' "employers" as that term is defined by the FLSA. 29 U.S.C. § 203(d).

219.    Defendants employed the named Plaintiffs and other J&T Workers in an enterprise "engaged in commerce or in the production of goods for commerce" as defined by 29 U.S.C. § 203(s)(1).

220.    Defendants failed to reimburse expenses that were incurred by Plaintiffs and other J&T Workers prior to their first week of work.

221.    These expenses were primarily for the benefit and convenience of Defendants.

222.    These expenses brought Plaintiffs' earnings and the earnings of other J&T Workers similarly situated below the minimum wage for that pay period.

223.    Defendants' violations were willful within the meaning of FLSA.

224.    As a result, Plaintiffs, and the other J&T Workers, suffered damages.

**SECOND CLAIM FOR RELIEF**
**Trafficking Victims Protection Reauthorization Act (TVPRA)**
All Individual Plaintiffs Against All Defendants

225.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

226.    This claim arises against Defendants under the TVPRA.

227.    In violation of 18 U.S.C. § 1589(a), J&T Defendants knowingly recruited, harbored, provided, or obtained, all Plaintiffs for labor or services by means of: (1) force or threats of force; (2) serious harm or threats of serious harm; (3) threatened abuse of law or legal process; or (4) a scheme, plan, or pattern intended to cause Plaintiffs to believe that, if they did not perform such labor or services, that they would suffer serious harm.

228.    In violation of 18 U.S.C. § 1589(b), Defendants knowingly or in reckless disregard of the facts, participated in a venture that obtained labor or services by means described in Paragraph 227 and thereby knowingly benefited financially.

229.    In violation of 18 U.S.C. § 1590, J&T Defendants knowingly recruited, harbored, transported, provided, or obtained, all Plaintiffs for labor or services in violation of 18 U.S.C. § 1589(a).

230.    Plaintiffs bring these claims pursuant to the civil cause of action for victims of forced labor under 18 U.S.C. § 1595.

231.    As a result of Defendants' actions, Plaintiffs have suffered damages.

### THIRD CLAIM FOR RELIEF

**Colorado Minimum Wages of Workers Act, Colo. Rev. Stat. §§ 8-6-101 *et seq*., as implemented by COMPS (7 Colo. Code Regs. § 1103-1)**
All Individual Plaintiffs Against All Defendants

232.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

233.    At all times relevant to this Complaint, Defendants were Plaintiffs' "employer" as set forth under Colorado wage laws. *See* 7 Colo. Code Reg. § 1103-1, Rule 1.6(A) (citing Colo. Rev. Stat. § 8-4-101(6)).

234.    At all times relevant to this Complaint, Plaintiffs were Defendants' "employees" as that term is defined under Colorado wage laws. *See* 7 Colo. Code Regs. § 1103-1, Rule 1.5(A) (citing Colo. Rev. Stat. § 8-4-101(5)).

235.    At all times relevant to this Complaint and at least since October 4, 2022, Defendants have been required to pay Plaintiff at least the minimum wage in effect in Colorado for work Plaintiff performed for Defendants pursuant to Colo. Rev. Stat. § 8-6-106 and 7 Colo. Code Regs. § 1103-1, Rule 3.1.

236.    Defendants did not pay Plaintiffs the minimum wage in effect in Colorado for all work Plaintiffs performed during all times relevant to this Complaint.

237.    Defendants' violation of the Colorado minimum wage laws was willful.

238.    As a result of Defendants' conduct, Plaintiffs suffered injuries.

239.    Plaintiffs are entitled to receive the wages and costs owed pursuant to Colo. Rev. Stat. § 8-6-118.

**FOURTH CLAIM FOR RELIEF**
**Colorado Wage Claim Act (CWCA), Colo. Rev. Stat. §§ 8-4-101 *et seq*.**
All Individual Plaintiffs Against All Defendants

240.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

241.    This Claim arises under the Colorado Wage Claim Act, Colo. Rev. Stat. §§ 8-101 *et seq*.

242.    At all times relevant to this Complaint, Defendants were Plaintiffs' "employers" as that term is defined in Colorado wage laws. 7 Colo. Code Regs. § 1103-1, Rule 1.6(A) (citing Colo. Rev. Stat. § 8-4-101(6)).

243.    At all times relevant to this Complaint, Plaintiffs were Defendants' "employees" as that term is defined under Colorado wage laws. 7 Colo. Code Regs. § 1103-1, Rule 1.5(A) (citing Colo. Rev. Stat. § 8-4-101(5)).

244.    Defendants did not pay all wages or compensation due and owing to Plaintiffs in accordance with Colo. Rev. Stat. § 8-4-109.

245.    Defendants' violations of the Colorado wage laws were willful.

246.    As a result of Defendants' conduct, Plaintiff suffered damages including lost wages and lost use of those wages in an amount to be determined at trial.

247.    Plaintiffs are entitled to recover in this civil action the unpaid wages they are owed, together with penalties, reasonable attorney fees and court costs. Colo. Rev. Stat §§ 8-4-109 and 8-4-110.

**FIFTH CLAIM FOR RELIEF**
**Breach of Contract**
All Individual Plaintiffs Against J&T Defendants

248.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

249.    J&T Defendants and each Plaintiff entered into employment contracts in 2022 by virtue of the 2022 J&T H-2A Job Order.

250.    Plaintiffs performed their obligations under these contracts until Defendants' conduct rendered their performance impossible.

251.    Defendants breached these contracts by failing to comply with the terms and conditions of Plaintiffs' employment contained therein.

252.    In the alternative, J&T Defendants entered into a contract with USDOL and agreed to abide by the terms of the H-2A Compliance Plan, as well as the H-2A provisions and implementing regulations, and Plaintiffs are intended third-party beneficiaries of those agreements.

253.    Defendants breached multiple provisions of the agreements by failing to comply with the terms of the H-2A Compliance Plan, as well as the H-2A provisions and implementing regulations.

254.    As a result of Defendants' conduct, Plaintiffs suffered damages.

**SIXTH CLAIM FOR RELIEF**
**Promissory Estoppel**
All Individual Plaintiffs Against J&T Defendants

255.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

256.    J&T Defendants and their agents made promises to Plaintiffs about their work in the United States on the H-2A visa.

257.    These promises include, but were not limited to, promises that Plaintiffs would work in Uvalde, Texas and be provided adequate housing, reimbursement for transportation and subsistence expenses to and from Plaintiffs' homes, dates upon which pay wages would be paid, the lawful hourly wage, and other conditions of employment including all those required under the H-2A program. 20 C.F.R. §§ 655.121(a)(3), 655.122, and 653.501.

258.    J&T Defendants should have reasonably expected that such promises would induce action and/or forbearance by Plaintiffs.

259.    Plaintiffs were in fact induced to act and/or refrain from acting based on such promises made by Defendant Olivarez in her individual capacity and/or while acting within the scope of her employment for Defendant J & T Harvesting, and her agents.

260.    J&T Defendants broke their promises to Plaintiffs.

261.    As a result of J&T Defendants' conduct, Plaintiffs suffered damages.

262.    Injustice can only be avoided by the enforcement of J&T Defendants' promises.

263.    Each of the promises made by Defendant Olivarez or her agents and relied upon by Plaintiffs were made while Defendant Olivarez was acting as an agent of Defendant J&T Harvesting, which should have expected that such promises would induce action and/or forbearance by Plaintiffs.

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
All Plaintiffs Against All Defendants

264.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

265.    Plaintiffs conferred a benefit to Defendants by laboring in their employ, with a value to be determined at trial.

266.    Defendants appreciated the benefits conferred upon them by Plaintiffs' work.

267.    Plaintiffs conferred this benefit upon Defendants at their own expense, because they were unable to perform other work for the benefit of themselves of other employers while working for Defendants and Defendants did not compensate them for the full value of their labor.

268.    Under the circumstances, it would be unjust for Defendants to retain the benefits conferred upon them by Plaintiffs without payment.

## EIGHTH CLAIM FOR RELIEF
### False Imprisonment
All Individual Plaintiffs Against J&T Defendants

269.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

270.    On multiple occasions, Defendants Ramon and Bravo, and Defendant Olivarez—in her individual capacity and while acting within the scope of her employment for J&T Defendants J&T Harvesting —and her agents intentionally restricted each Plaintiff's freedom of movement directly or indirectly through fear by making threats against Plaintiffs and/or by confiscating their identification documents, restricting their communication, and monitoring or surveilling them constantly without the Plaintiffs' consent or any legal authority.

46

271.    Each Plaintiff's freedom of movement was restricted at the house in Uvalde, Texas, the motel in Del Norte, Colorado, and the house in Center, Colorado.

272.    Each Plaintiff's freedom of movement was restricted for a period of multiple days.

273.    J&T Defendants achieved each Plaintiff's confinement by threat or force, including through the confiscation of Plaintiffs' travel documents and threats to report Plaintiffs to immigration if they left.

274.    Each Plaintiff was aware that his freedom of movement was restricted.

275.    J&T Defendants' actions were willful and wanton, committed purposefully, heedlessly and recklessly and without regard to the consequences thereof or to the rights and safety of each Plaintiff.

276.    As a result of J&T Defendants' conduct, each Plaintiff suffered damages.

### NINTH CLAIM FOR RELIEF
**Outrageous Conduct**
All Individual Plaintiffs Against All Defendants

277.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

278.    Defendants engaged in a course of conduct that constituted extreme and outrageous conduct toward the Plaintiffs.

279.    Defendants acted recklessly or with the intent of causing Plaintiffs severe emotional distress.

280.    Defendants engaged in this outrageous conduct while acting in a position of actual or apparent authority or power over Plaintiffs.

281.    Defendants' actions were willful and wanton in that they committed such actions purposefully, heedlessly, recklessly, without regard to the consequences or to the rights and safety of Plaintiffs.

282.    Defendants' conduct caused Plaintiffs to suffer extreme emotional distress.

283.    As a result, Plaintiffs have suffered emotional injuries and damages.

**TENTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**
All Individual Plaintiffs Against All Defendants

284.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding and foregoing paragraphs.

285.    Defendants owed Plaintiffs a duty to avoid creating an unreasonable risk of bodily harm, emotional disturbance, or emotional distress.

286.    Defendants were negligent in creating an unreasonable risk of bodily harm, emotional disturbance, or emotional distress to Plaintiffs.

287.    Defendants' negligence caused Plaintiffs to be put in fear for their own safety and such fear resulted in negative physical consequences and prolonged emotional and physical disturbance and other damages for the Plaintiffs.

288.     J&T Defendants and their agents committed said acts while acting within the scope of their employment for Defendant J&T Harvesting, LLC.

289.    As a result, Plaintiffs suffered severe emotional distress and other damages.

**VI.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their behalf and against Defendants and award Plaintiffs the following:

a.  Declaring that Defendants violated the TVPRA;

b.  Judgment in favor of Plaintiffs and awarding damages, both actual and punitive, pursuant to the TVPRA;

c.  Certifying a FLSA Collective Action pursuant to 29 U.S.C. § 216(b) on behalf of all similarly situated J&T Workers as described herein;

d.  Declaring that Defendants violated the FLSA;

e.  Declaring that J&T Defendants breached the employment contracts with Plaintiffs;

f.  Declaring that J&T Defendants breached the contracts with the USDOL of which Plaintiffs are third-party beneficiaries;

g.  Judgment in favor of Plaintiffs and all similarly situated workers who opt in to this action and award any unpaid wages and liquidated damages pursuant to the FLSA;

h.  Judgment in favor of Plaintiffs on their contract claims and awarding damages for J&T Defendants' contractual breaches;

i.  Judgment in favor of Plaintiffs on their Colorado Minimum Wages for Workers Act claim and Colorado Wage Claim Act claim for all unpaid wages and awarding damages;

j.  Judgment in favor of Plaintiffs and awarding damages for Defendants' unjust enrichment;

k.  Judgment in favor of Plaintiffs and awarding damages for Defendants' false imprisonment, negligent infliction of emotional distress and outrageous conduct regarding Plaintiffs;

l.  Penalty damages as allowed by law on Plaintiffs' claim for relief under the Colorado
    Wage Claim Act;

m.  Attorney fees and costs as provided for by law; and

n.  Pre- and post-judgment interest, costs and expert witness fees and such other relief as
    the Court deems just and proper.

**PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**Respectfully submitted this 15th day of October, 2024.**

**COLORADO LEGAL SERVICES**

**s/ Jenifer C. Rodriguez**
Jenifer Rodriguez

**s/ Deanna Tamborelli**
Deanna Tamborelli

**s/ David Valleau**
David Valleau

Farm Workers Rights Division
Colorado Legal Services
1905 Sherman Street, Suite 400
Denver, CO 80203
(303) 866-9366
jrodriguez@colegalserv.org
dtamborelli@colegalserv.org
dvalleau@colegalserv.org

*Attorneys for Plaintiffs*
